J-S74034-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| KYSHIM M. HENDERSON | : | |
| | : | |
| Appellant | : | No. 1284 EDA 2019 |

Appeal from the Order Entered March 29, 2019
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0007718-2009

BEFORE: BENDER, P.J.E., MURRAY, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.: **FILED MARCH 09, 2020**

Appellant Kyshim M. Henderson appeals from the order entered by the Court of Common Pleas of Philadelphia County denying Appellant's second petition pursuant to the Post Conviction Relief Act (PCRA), 42 Pa.C.S.A. §§ 9541-46. Appellant argues that he is entitled to a new trial based on the after-discovered testimony of a witness who claims to have committed the murder for which Appellant was convicted. We affirm.

On August 8, 2008, Rashawn Howard ("the complainant") was shot six times in the courtyard located at 623 North Franklin Place in Philadelphia. After the complainant was rushed to a local hospital, he died as a result of his gunshot wounds. Responding officers did not recover any weapons from the crime scene or from the complainant's person.

_____

[*] Former Justice specially assigned to the Superior Court.

On September 16, 2008, after Lyle Littlejohn had been brought into police custody on unrelated charges, he gave detectives a signed, written statement identifying Appellant as the individual who shot the complainant. Littlejohn, who referred to Appellant as "Mike" or "Cherp," indicated that he knew Appellant for years. Further, Littlejohn told officers that the complainant had allegedly robbed Appellant on a prior occasion.

Littlejohn recalled that on the night of the murder, Appellant and the complainant began arguing at a dice game in the courtyard. Littlejohn saw Appellant shoot at the complainant's legs seven times and watched Appellant run into the third house on Green Street. Littlejohn told detectives that he came forward with this identification as he was friends with the complainant.

On September 22, 2008, a second witness, Germaine Thompson, gave a signed, written statement to police identifying Appellant as the individual who shot the complainant. Thompson knew Appellant as "Mike" and noted that Appellant was his sister's neighbor in the Penntown Projects where the shooting occurred. Thompson recalled that on the night of the complainant's murder, he heard an argument in the courtyard where a dice game was taking place. When Thompson looked over to this location, he saw Appellant shoot the complainant's legs five or six times with a small, black gun and then run out of the courtyard toward Green Street.

After Appellant was charged with the complainant's murder, he proceeded to a bench trial. While Littlejohn and Thompson previously gave statements to the police identifying Appellant as the individual who shot the

complainant, both men recanted their testimony at trial. Littlejohn claimed he was not in the courtyard at the time of the shooting but asserted that detectives told him that Appellant committed the complainant's murder and made Littlejohn circle Appellant's picture in a photo array. Thompson similarly claimed that he was not in the courtyard at the time of the complainant's murder and contended that detectives directed him to identify Appellant as the perpetrator of the complainant's murder. The Commonwealth introduced both men's statements at trial as prior inconsistent statements.

A third witness, Sheryl Smith, testified at Appellant's trial. Smith knew Appellant for years and referred to him as "Mike-Mike." She recalled seeing both Appellant and Thompson in the courtyard at the time of the complainant's murder. While she was walking into the courtyard, she heard the shots being fired, observed a gun in Appellant's hand, and saw Appellant run toward Green Street after the shots were fired.

On March 20, 2010, the trial court convicted Appellant of third-degree murder and possession of an instrument of crime. On June 11, 2010, Appellant was sentenced to an aggregate term of eighteen (18) to thirty-six (36) years' incarceration followed by five years' probation. On January 23, 2012, this Court affirmed the judgment of sentence and on July 16, 2012, our Supreme Court denied Appellant's petition for allowance of appeal.

On April 23, 2013, Appellant filed his first PCRA petition, which was subsequently dismissed on January 29, 2014. On July 8, 2015, this Court

affirmed the dismissal of the petition and on February 2, 2017, our Supreme Court denied Appellant's petition for allowance of appeal.

On November 6, 2017, Appellant filed the instant PCRA petition, claiming that he was entitled to a new trial based on the testimony of Marcus Williams, who claimed to have committed the complainant's murder. Appellant claims that he received this information when Williams approached him on September 16, 2017 in prison and confessed to the shooting.

On January 4, 2019, the PCRA court held an evidentiary hearing at which Williams testified. Williams claimed that on the night in question, he went to the Penntown Projects with a friend, Derrick Davis (also known as "Black"), to buy a pound of marijuana. As the men were unfamiliar with the neighborhood, Williams armed himself with a 9-millimeter firearm and waited in the courtyard while Davis went into the seller's house to purchase the drugs. Williams claimed that the men traveled to this location as they could obtain the marijuana cheaper there.

Once in the courtyard, Williams claimed that he joined a dice game while he was waiting for Davis. Shortly thereafter, the complainant approached and began arguing with one of the individuals playing dice. Williams believed the complainant had mental health issues or was high as the complainant was acting aggressively, stumbling, mumbling to himself, and cursing.

At one point, the complainant brushed up against Williams and asked where he was from. Thereafter, Davis met up with Williams and the two men started to leave the courtyard. The complainant called out to Williams, "yo,

bro, let me holla at you." Notes of Testimony (N.T.), PCRA Hearing, 1/4/19, at 14. Williams went back to the complainant to continue the conversation. The complainant pulled a gun from behind his back and told Williams to put his money and gold chain on the ground. When Williams complied, the complainant picked up the money and chain while still pointing the gun at him. The complainant threatened to kill Williams as he was not from his neighborhood.

Williams recalled that he suddenly heard an unidentified woman cry out, "let me get my kids, let me get my kids, oh my God." *Id*. at 17. Williams testified that the woman's cry drew the complainant's attention, giving Williams an opportunity to pull out his own firearm and fire it at the complainant in self-defense. Williams indicated that he shot at the complainant's legs to get him on the ground. Thereafter, Williams threw his gun in a dumpster and left the scene with Davis.

Williams was subsequently incarcerated for a probation violation. When Williams called Davis from prison, he found out that the complainant had passed away and that an individual named "Cherp" was charged with the murder. Davis told Williams to "keep his mouth shut." *Id*. at 22. Several months before Williams was paroled, Davis passed away.

After Williams was released from prison, he was subsequently convicted of robbery and sentenced to six to twelve years' incarceration. While in prison, in 2017, Williams discovered that a man referred to as "Cherp" was in the same correctional facility. Williams claimed that he felt guilt over the

complainant's murder and had to "come clean with God." *Id*. at 25. Thereafter, Williams confessed to Appellant ("Cherp") that he had murdered the complainant. At Appellant's request, Williams subsequently made a statement to a private investigator on October 19, 2017. Despite the fact that Appellant and Williams were in the same prison for fifteen months and traveled together on a bus from SCI Benner to SCI Phoenix, Williams claimed he never spoke to Appellant again and denied having any mutual friends.

In response to Appellant's petition, the Commonwealth presented the PCRA court with exhibits documenting both Williams and Appellant's messages using the prison email system. The exhibits first showed that both Williams and Appellant had contact with Durward Allen, a former inmate at the same prison as Appellant and Williams. Just days after Williams gave his statement to the private investigator, on October 26, 2017, prison records show that Allen requested to be an email contact of both Williams and Appellant on the same day. Inmate Messages Report (Williams), at 24; Inmate Messages Report (Appellant), at 100. *Id*. On October 31, 2017, Allen messaged Appellant to tell him, "I'm still working on that situation we talked about for you." Inmate Messages Report (Appellant), at 101. On March 25, 2018, Allen sent Williams an email stating, "I'll have something for you in a little bit." Inmate Messages Report (Williams), at 25.

The prison records also show that Williams also had contact with Kennesha Watson, Appellant's girlfriend. On January 14, 2018, Watson contacted Williams and was added to his contact list. On April 12, 2018,

Williams contacted his girlfriend, Jasmine Taylor, and told her to stop stressing because he would send her money "if shit work out." *Id*. at 30. On April 15, 2018, Appellant's girlfriend, Watson, sent Williams an email telling him that she was going to send him money but had not done so as she asserted that Appellant had stopped calling her. *Id*. at 31. On August 5, 2018, Williams sent his own girlfriend, Taylor, an email promising to provide her a "house[,] money[,] cars[,] kids education paid," but indicated that he might have to come back to prison. *Id*. at 36.

On March 29, 2019, the PCRA court held a second hearing at which it allowed counsel to present oral argument. At this hearing, the PCRA court expressly denied Appellant's petition and set forth its rationale for doing so on the record. On April 21, 2019, Appellant filed a timely appeal. Thereafter, Appellant complied with the trial court's direction to file a Concise Statement of Errors Complained of on Appeal pursuant to Pa.R.A.P. 1925(b).

As an initial matter, we must determine whether Appellant's PCRA petition was timely filed. It is well-established that "the PCRA's timeliness requirements are jurisdictional in nature and must be strictly construed; courts may not address the merits of the issues raised in a petition if it is not timely filed." *Commonwealth v. Walters*, 135 A.3d 589, 591 (Pa.Super. 2016) (citations omitted). Generally, a PCRA petition "including a second or subsequent petition, shall be filed within one year of the date the judgment of sentence becomes final." 42 Pa.C.S.A. § 9545(b)(1). A judgment of sentence

becomes final at the conclusion of direct review or the expiration of the time for seeking the review. 42 Pa.C.S.A. § 9545(b)(3).

However, our courts may consider an untimely petition if the appellant explicitly pleads and proves one of the three exceptions enumerated in Sections 9545(b)(1)(i)-(iii), which include: (1) the petitioner's inability to raise a claim as a result of governmental interference; (2) the discovery of previously unknown facts or evidence that would have supported a claim; or (3) a newly-recognized constitutional right that has been held to apply retroactively by the Supreme Court of the United States or the Supreme Court of Pennsylvania. 42 Pa.C.S.A. § 9545(b)(1)(i)-(iii).

As noted above, the trial court sentenced Appellant on June 11, 2010, this Court affirmed the judgment of sentence on January 23, 2012, and our Supreme Court denied Appellant's petition for allowance of appeal on July 16, 2012. Appellant did not seek further review with the Supreme Court of the United States.

As a result, Appellant's judgment of sentence became final on October 14, 2012, after the expiration of the ninety-day period in which he was allowed to file a petition for certiorari with the Supreme Court of the United States. *See* U.S.Sup.Ct.R.13(1) (stating "a petition for a writ of *certiorari* to review a judgment in any case ... is timely when it is filed with the Clerk of this Court within 90 days after entry of the judgment"). Thus, Appellant needed to file his PCRA petition by October 14, 2013. As Appellant filed the instant petition on November 6, 2017, this petition is facially untimely.

Appellant claims that his petition meets the newly-discovered evidence timeliness exception under Section 9545(b)(1)(ii), claiming that he could prove his innocence with the confession of Marcus Williams to the complainant's murder. In reviewing this assertion, we are careful to note the distinctions between the PCRA's newly-discovered fact timeliness exception and the standard governing after-discovered evidence. Our Supreme Court has provided:

> the newly-discovered facts exception to the time limitations of the PCRA, as set forth in subsection 9545(b)(1)(ii), is distinct from the after-discovered evidence basis for relief delineated in 42 Pa.C.S. § 9543(a)(2). To qualify for an exception to the PCRA's time limitations under subsection 9545(b)(1)(ii), a petitioner need only establish that the facts upon which the claim is based were unknown to him and could not have been ascertained by the exercise of due diligence. However, where a petition is otherwise timely, to prevail on an after-discovered evidence claim for relief under subsection 9543(a)(2)(vi), a petitioner must prove that (1) the exculpatory evidence has been discovered after trial and could not have been obtained at or prior to trial through reasonable diligence; (2) the evidence is not cumulative; (3) it is not being used solely to impeach credibility; and (4) it would likely compel a different verdict. **Commonwealth v. D'Amato**, 579 Pa. 490, 856 A.2d 806, 823 (2004); *see* [**Commonwealth v.**] **Cox**, [636 Pa. 603, 614,] 146 A.3d [221,] 227–28 [(2016)] ("Once jurisdiction has been properly invoked (by establishing either that the petition was filed within one year of the date judgment became final or by establishing one of the three exceptions to the PCRA's time-bar), the relevant inquiry becomes whether the claim is cognizable under [Section 9543] of the PCRA.").

**Commonwealth v. Burton**, 638 Pa. 687, 705, 158 A.3d 618, 629 (2017).

In this case, we agree with the PCRA court's finding that Appellant has established that Williams' testimony was unknown to him and could not have been ascertained by the exercise of due diligence. As Appellant satisfied the

newly-discovered fact timeliness exception, we may proceed to determine whether he raised a cognizable claim under the PCRA based on his after-discovered evidence claim.

There is no dispute that Appellant has proven the first three prongs of the after-discovered evidence test as Williams' confession was discovered after trial and could not have been obtained at or prior to trial through reasonable diligence, Williams' confession is not cumulative evidence, and the confession would not be used solely to impeach credibility.

However, the PCRA court found that Appellant did not prove that the admission of Williams' conviction would likely compel a different verdict as the PCRA court found the record contained overwhelming evidence of Appellant's guilt at his trial given that the prosecution had presented the accounts of three eyewitnesses who identified Appellant as the individual who shot the complainant multiple times. These witnesses gave consistent statements to the police shortly after the complainant's murder and none of the witnesses indicated that the complainant had a firearm.

In addition, the PCRA court found Williams' confession to the complainant's murder was not credible. The PCRA court was skeptical of Williams' testimony that the complainant tried to rob Williams in a courtyard full of bystanders. As Williams claimed to be a stranger to the neighborhood, the PCRA court questioned why none of the thirty to forty witnesses to the shooting were willing to describe the stranger for the police to protect their community, but instead attempted to cover for the shooter. The PCRA court

also pointed out that none of the three witnesses who gave statements to police observed the complainant with a weapon as Williams had claimed.

Moreover, the PCRA court found the veracity of Williams' statement was called into question by messages he sent and received through the prison email system. The PCRA court noted that not only did Williams lie about having mutual connections with Appellant, but the "timing and content of those messages suggest collusion" between Williams and Appellant. N.T. PCRA Hearing, 3/29/19, at 36. The PCRA court pointed to a message in which Appellant's girlfriend promised to send Williams money and a subsequent message from Williams to his own girlfriend, in which he promised to pay for a car, house, and their children's education with the caveat that he might have to go back to prison. The PCRA court did not believe Williams' assertion that he and Appellant never spoke again about the shooting even though they were incarcerated in the same prison for fifteen months and had even traveled together between two state correctional institutions on a 197-mile bus trip.

Accordingly, we agree with the PCRA court's finding that Appellant failed to prove that the admission of Williams' conviction would likely compel a different verdict and conclude that the PCRA court correctly rejected Appellant's request for a new trial based on after-discovered evidence.

For the foregoing reasons, we affirm the PCRA court's order denying Appellant's petition.

Order affirmed.

*Judgment Entered.*

*Joseph D. Seletyn, Esq.*
*Prothonotary*


*Date: 3/9/2020*